*In the Matter of the Petition of Storm Cintron*, No. 417, Sept. Term, 2024. Opinion filed on May 6, 2025, by Wells, C.J.

**CRIMINAL LAW – EXPUNGEMENT – CUSTODIAN OF RECORDS**

Under Maryland Code Annotated, Criminal Procedure Article ("CP") § 10-105, a person charged with the commission of a crime who was acquitted may file a petition listing relevant facts for expungement of a police record, court record, or other record maintained by the State or a political subdivision of the State. The petition is generally filed in the court in which the proceeding began. Once a court enters an order granting expungement, under Maryland Rule 4-508, the clerk of that court serves a true copy of the order on each custodian of records designated. Custodians of records subject to the expungement order shall advise in writing the court and the person seeking expungement of compliance with the order.

In this case, the District Court of Maryland for Howard County (the "District Court") ordered expungement of Cintron's records. The expungement order did not list Baltimore Police Department ("BPD") as a custodian of records. Because a court only needs to serve an expungement order on custodians designated in the order, the District Court was not required to serve Cintron's expungement order on BPD. And because only custodians of police or court records subject to the order of expungement must comply with the order, BPD did not need to comply with Cintron's expungement order. Accordingly, the photographs in BPD's custody were not subject to Cintron's expungement order.

**CRIMINAL LAW – EXPUNGEMENT – CUSTODIAN OF RECORDS**

Under Maryland Rule 4-508, an order for expungement of records shall be substantially in the form set forth in Form 4-508.1. Form 4-508.1 specifies that custodians of records designated in the order shall expunge all court and police records in their custody. The notice at the end of Form 4-508.1 also specifies that, until a custodian of records has received a copy of an expungement order and filed a Certificate of Compliance, expungement of the records in the custodian of that custodian is not complete and may not be relied upon.

Here, Cintron's expungement order used the exact language from Form 4-508.1. Only the custodians listed in Cintron's order, including Howard County Police Department ("HCPD"), needed to expunge records in their custody. HCPD received a copy of Cintron's expungement order and filed a Certificate of Compliance, so Cintron can rely upon HCPD's expungement of police records in HCPD's custody. However, when the District Court issued Cintron's expungement order to HCPD, the photographs BPD eventually introduced before Cintron's Administrative Hearing Board were not in HCPD's custody— they were in BPD's custody. Therefore, HCPD had no duty under Cintron's expungement

order or any provision of Maryland expungement law to expunge the photographs in BPD's custody.

## CRIMINAL LAW – EXPUNGEMENT – PURPOSE

The Maryland General Assembly enacted Maryland's expungement law in part to balance an individual's privacy interest against society's need for efficient law enforcement. This purpose is reflected in the definition of expungement under CP § 10-101(e). Namely, the statute defines expungement not as erasure or total destruction of court or police records but as removal from public inspection.

At oral argument before this Court, Cintron's counsel described the purpose of Maryland's expungement law as erasure—past, present, and future. This is incorrect. It does not align with either the definition of expungement under CP § 10-101(e), or with the General Assembly's purpose in enacting Maryland's expungement law.

## CRIMINAL LAW – EXPUNGEMENT – HARMLESS ERROR

Maryland appellate courts do not reverse for harmless error, and the burden is on the appellant to show prejudice and error. Prejudice is defined as error that influenced the outcome of the case. Erroneous admission of cumulative evidence—that is, evidence that tends to prove the same point as other evidence presented—is harmless.

Even if, purely for the sake of argument, we were to conclude the Administrative Hearing Board erred in allowing BPD to admit copies of the photographs taken by HCPD as evidence at Cintron's hearing, such error was harmless. First, photographs of Cintron's injuries and the hole in the bathroom door that were admitted constitute cumulative evidence because an HCPD officer testified as to Cintron's injuries and the hole. Accordingly, if the admission of these photographs into evidence constituted error, it was harmless. Moreover, there is nothing in the record to indicate any of the photographs influenced the Administrative Hearing Board's finding of guilt and recommendation to terminate Cintron's employment with BPD.

Circuit Court for Baltimore City
Case No. 24-C-23-003682

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0417

September Term, 2024

_____

IN THE MATTER OF THE PETITION
OF STORM CINTRON

_____

Wells, C.J.,
Nazarian,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wells, C.J.

_____

Filed: May 6, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case arises from the termination of Storm Cintron, appellant, from the Baltimore City Police Department ("BPD"), appellee. Cintron, a BPD Officer, lived in Howard County with his wife, Venus Ortiz. On April 18, 2021, officers from the Howard County Police Department ("HCPD") responded to a call at Cintron's residence for a reported domestic assault. HCPD photographed property damage at the scene and injuries to Cintron and Ortiz. In August 2021, Cintron was tried for second-degree assault before a judge in the District Court for Howard County. The judge found Cintron not guilty. Cintron filed a request to expunge records related to the assault charge, which was granted and ordered in October 2021. BPD was not listed a custodian of records on the expungement order.

On April 20, 2021, BPD launched an investigation into Cintron's incident with Ortiz. BPD Detective Melvin Valdes requested HCPD to send their records concerning the incident. Detective Valdes received copies of those records, specifically HCPD's photographs of the scene and injuries to Cintron and Ortiz, on June 1, 2021.

A year later, in April 2022, BPD brought two administrative charges against Cintron for violating BPD policy governing conduct of BPD officers. Cintron requested a trial before an Administrative Hearing Board.[1] Over objection from Cintron, the Board allowed BPD to admit copies of the photographs taken by HCPD on the night of April 18, 2021. The Board found Cintron guilty of both charges and recommended terminating his employment, which the acting BPD Police Commissioner accepted. Cintron appealed the

---

[1] We use "Administrative Hearing Board" and "the Board" interchangeably.

Board's decision to the Circuit Court for Baltimore City. The circuit court affirmed the Board's decision, finding the photographs were lawfully obtained by BPD and not subject to the expungement order.

Cintron filed this timely appeal. He submits one questions for our review, which we slightly rephrase:[2]

> Did the Administrative Hearing Board err in allowing BPD to admit copies of the photographs taken by HCPD as evidence at Cintron's hearing?

For the following reasons, we conclude the Board did not err in allowing BPD to admit copies of the photographs as evidence. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 18, 2021, HCPD responded to a call at Cintron's residence for a reported domestic assault. Upon arrival, HCPD Officer Fogle spoke with Cintron, who explained he discovered Ortiz's OnlyFans account and confronted her about it.[3] Cintron told Officer Fogle that Ortiz threw a mirror against a wall near Cintron and brandished scissors at him, but he sustained no injuries. After Officer Fogle explained to Cintron that he needed to hear Ortiz's side of the story, Cintron told Officer Fogle that he did have injuries. Officer

---

[2] Cintron's verbatim question is:

Did the Administrative Hearing Board err as a matter of law by allowing the BPD to introduce evidence pertaining to an expunged matter?

[3] OnlyFans is an online platform "that enables creators, who are largely women, to provide subscription access to pornographic content to users, who are largely men." Lauren Boone, *"Because of Sex": Title VII's Failures Leave Legal Sex Workers Unprotected*, 100 N.C. L. REV. 883, 890 (2022).

Fogle observed fresh scratch marks, peeled-back skin, and blood on Cintron's right arm and hand, which HCPD personnel photographed.

Officer Fogle then interviewed Ortiz, who said Cintron was angry at her, began yelling, then grabbed and pushed her. She then described how she threw a mirror at the wall and ran to hide behind a locked door. Ortiz explained how Cintron punched the door numerous times until he could open it, threatening to kill Ortiz while doing so. Officer Fogle observed an approximately six-inch hole in the bathroom door, "consistent with a forceful punch of something through it." HCPD personnel also took photographs of broken glass from the mirror, the hole in the bathroom door, and Ortiz's broken nails on almost all her fingers.

On April 20, 2021, BPD opened an investigation into the incident, which was led by Detective Valdes. He sent a letter to HCPD requesting HCPD to send its records from the April 18 incident.[4] He received copies of HCPD's reports on May 26, 2021, and copies of HCPD's photographs on June 1, 2021.

Approximately one month after the incident, Cintron was charged with second-degree assault. He was tried in the District Court for Howard County on August 26, 2021 on that charge. The judge found Cintron not guilty.

---

[4] In its brief to this Court, BPD claims this letter was a Maryland Public Information Act ("MPIA") request for HCPD's records. The circuit court's decision, discussed *infra*, also notes BPD acquired HCPD's records pursuant to an MPIA request. We did not receive a copy of the MPIA request, and Cintron did not include in his brief whether BPD received the records via an MPIA request. We will assume the letter was not an MPIA request, but whether the letter was an MPIA request or not does not affect our analysis.

Cintron filed a request with the District Court to expunge records related to the assault charge. The court granted that request on October 13, 2021. Specifically, the court

> ORDERED that the clerk forthwith shall serve on each custodian of police and court records designated in this Order and on the Central Repository a copy of this Order together with a blank form of Certificate of Compliance; and it is further

> ORDERED that within 60 days after the entry of this Order … the clerk and the following custodians of court and police records and the Central Repository shall (1) expunge all court and police records pertaining to this action or proceeding in their custody, (2) file an executed Certificate of Compliance, and (3) serve a copy of the Certificate of Compliance on the applicant/petitioner/defendant; and it is further

> ORDERED that the clerk and other custodians of records forthwith upon receipt of this Order … shall remove the records from public inspection[.]

The court's expungement order listed four specific custodians of Cintron's records: (1) Criminal Justice Information System (known as CJIS or CJIS Central Repository), (2) District Court of Maryland-Howard County, (3) HCPD, and (4) Howard County State's Attorney's Office. The order did not list BPD as a custodian. Further, the last page of the order included a notice:

> **NOTICE TO APPLICANT/PETITIONER/DEFENDANT**: Until a custodian of records has received a copy of this Order AND filed a Certificate of Compliance, expungement of the records in the custody of that custodian is not complete and may not be relied upon.

The record provided to this Court by Cintron includes Certificates of Compliance from the District Court for Howard County and HCPD.

In December 2021, Detective Valdes interviewed Cintron as part of his investigation. Cintron denied threatening to kill Ortiz and punching a hole in the bathroom

4

door. He said Ortiz broke the door and mirror in the bathroom. He also explained he injured his hands by hitting a punching bag with his bare hands, and Ortiz injured his arms with scissors. Detective Valdes also interviewed Ortiz in early 2022, during which she denied attacking Cintron with scissors but admitted to throwing the mirror and breaking it. Ortiz also explained that Cintron broke the bathroom door, threatened to kill her, and broke her nails by pushing her.

On April 14, 2022, BPD brought two administrative charges against Cintron, alleging he violated Policy 302 of BPD's Policies and Training Materials. Specifically, BPD charged Cintron with:

> **CHARGE 1: Policy 302: RULES AND REGULATIONS, <u>RULES AND REGULATIONS</u>, RULE 1: CONDUCT []**
> Any breach of the peace, neglect of duty, misconduct or any conduct or omission on the part of any member of the Department, either within or outside the City of Baltimore, and whether on or off duty, which tends to undermine the good order, efficiency or discipline of the Department, or which reflects discredit upon the Department or any member thereof, or which is prejudicial to the efficiency and discipline of the Department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct unbecoming a member of the BPD, and subject to disciplinary action by the Police Commissioner, unless such conduct is protected by the Constitution of the United States, the Maryland Declaration of Rights, or any other federal, state or local law.

> **Police Officer Storm Cintron did violate Policy 302: RULES AND REGULATIONS, <u>RULES AND REGULATIONS</u>, RULE 1: CONDUCT** in the following way:
> A. On or about April 18, 2021, Police Officer Storm Cintron threatened to kill his wife.

> **CHARGE 2: Policy 302: RULES AND REGULATIONS, <u>RULES AND REGULATIONS</u>, RULE 1: CONDUCT, SECTION 15 []**
> Members will not make, orally or in writing, any false statement, or misrepresentation of any material fact, or make any material omission of fact,

including but not limited to statements or omissions made with the intent to mislead any person or tribunal.

**Police Officer Storm Cintron did violate Policy 302: RULES AND REGULATIONS, <u>RULES AND REGULATIONS</u>, RULE 1: CONDUCT, Section 15** in the following way:

A. On or about April 18, 2021, Police Officer Storm Cintron made a false statement to Howard County Police Officer First Class Garrett Fogle concerning how injuries to his person were sustained.

BPD recommended terminating Cintron from employment for these alleged violations of Policy 302. Cintron elected to be tried before an Administrative Hearing Board.[5]

At the Board hearing on August 1, 2023, BPD made a preliminary motion to admit copies of HCPD's records related to Cintron's assault charge, arguing BPD obtained the records prior to the expungement order to which BPD was not a party. Cintron objected to BPD's motion, arguing the records were expunged and therefore could not be used in the Board hearing. Over Cintron's objection, the Board granted BPD's motion.

During the hearing, BPD introduced copies of the photographs taken by HCPD on April 18, 2021, depicting Cintron's and Ortiz's injuries, as well as damage to the bathroom.[6] Officer Fogle also testified as to Cintron's injuries, describing them as follows:

---

[5] This right comes from the Law Enforcement Officers' Bill of Rights ("LEOBR"). Md. Code Ann., Pub. Safety §§ 3-101–3-113 (2003, 2019 Repl. Vol.). The Maryland General Assembly repealed and replaced the LEOBR with the "Maryland Police Accountability Act," effective July 1, 2022. *See* 2021 Md. Laws, Ch. 59. However, both parties agree the LEOBR controls in this case because Cintron's alleged misconduct that led to his termination from BPD occurred prior to the LEOBR's repeal.

[6] Specifically, BPD introduced these photographs during its direct examination of Detective Valdes. The photographs were introduced as evidence, as well as Detective Valdes' letter requesting HCPD's records.

So, [Cintron] showed me the injuries. It was on his right hand and arm. I observed the injuries to be consistent with fresh scratch marks, skin peeled back. They were bleeding. I did not observe any laceration or slicing marks.

When asked where the injuries were located on Cintron, Officer Fogle said, "I believe they were across his hand, the knuckle region, and then up on his forearm a little bit." And when later asked to explain his observations of the bathroom door, Officer Fogle responded:

So, the door -- the hole in the door was about 6 or 7 inches around. It was splintered on the other side, which was, in my training, observation and experience, consistent with a forceful punch of something through it. And there was a complete hole through the door, so whatever made it through the hole got to the other side.

Officer Fogle further testified about his interviews of Cintron and Ortiz on the night of April 18, 2021, as previously discussed. BPD also introduced into evidence Detective Valdes' interview of Ortiz from early 2022 and his interview of Cintron from December 2021.[7]

In its written decision, the Board made the following findings of fact:

Based on the testimony and evidence presented at the hearing, the Board makes the following findings of fact, based on the preponderance of the evidence:

On April 18, 2021, the accused, Officer Storm Cintron, while off-duty got into an argument with his wife, Ms. Veinus [sic] Ortiz after confronting her about content posted on a website.

The argument escalated at which time Officer Cintron began punching a bathroom door in attempt to get Ms. Ortiz who had locked herself inside said bathroom. Officer Cintron threatened to kill Ms. Ortiz and lied to both responding officers and PIB investigators about how he obtained injuries to his hand and arm.

---

[7] BPD had Detective Valdes read a transcript of the interview aloud instead of playing the audio recording because Ortiz spoke Spanish during the interview. The transcript was translated into English.

After recounting these findings, the Board found Cintron guilty of violating the two provisions of BPD Policy 302 and recommended Acting BPD Police Commissioner Richard Worley terminate Cintron's employment. The Acting Commissioner accepted the Board's recommendation on August 11, 2023, thereby terminating Cintron's employment with BPD.

Cintron appealed the Board's decision to the Circuit Court for Baltimore City, arguing the Board erred by allowing BPD to introduce copies of HCPD's photographs because those photographs were subject to the expungement order. The circuit court affirmed the Board's decision, explaining:

> [BPD] lawfully obtained the records pursuant to a Maryland Public Information Act request. [BPD] was not directed to and served with the expungement order. [BPD] did not seek to expunge the record under the Law Enforcement Officers' Bill of Rights. [Cintron's] information could be used as impeachment or exculpatory evidence in a criminal case, and [Cintron's] right to privacy is outweighed by the need for public safety and effective law enforcement.

Cintron then filed this timely appeal. We will add additional facts when necessary.

**STANDARD OF REVIEW**

The scope of review for "agency action taken pursuant to the LEOBR by county police departments," such as proceedings before a police department's administrative hearing board, is "that generally applicable to administrative appeals." *Montgomery Cnty. v. Stevens*, 337 Md. 471, 482 (1995). "When reviewing a decision by an administrative agency, this Court 'looks through' the decision of the circuit court, applying the same standards of review to determine whether the agency itself erred." *Matter of Homick*, 256 Md. App. 297, 307 (2022) (citation omitted). "We are limited to evaluating whether there

8

is substantial evidence in the record as a whole to support the agency's findings and conclusions and to determining whether the administrative decision is premised upon an erroneous conclusion of law." *Id.* at 307-08 (quoting *Brandywine Senior Living at Potomac LLC v. Paul*, 237 Md. App. 195, 210 (2018)). "We review *de novo* an agency's conclusions of law. This includes questions of statutory interpretation." *Hayden v. Md. Dep't of Nat. Res.*, 242 Md. App. 505, 521 (2019) (internal citations omitted).

## DISCUSSION

### I. The Administrative Hearing Board Did Not Err in Allowing BPD to Introduce Copies of the Photographs as Evidence at Cintron's Hearing.

#### A. Parties' Contentions

Cintron contends the Board erred in allowing BPD to introduce copies of the photographs obtained from HCPD because those photographs were expunged. Cintron argues that, even though the expungement order did not name BPD as a custodian of Cintron's records and BPD was not served a copy of the order, the order applied to BPD. He also posits that, because the order named CJIS as a custodian, "it logically follows that other Maryland state agencies in possession of those records should also be required" to expunge Cintron's records. Cintron further argues that, because BPD received the photographs from HCPD, a named custodian in the order, "the logical conclusion, then, would be that all records disseminated by [HCPD] pertaining to [Cintron's] criminal matter are also subject to the order of expungement."

Cintron additionally contends this Court's application of criminal expungement law in *Gigeous v. Eastern Correctional Institution*, 132 Md. App. 487 (2000), and the Maryland

9

Supreme Court's decision in that same case, 363 Md. 481 (2001), concludes expunged criminal records are categorically inadmissible in administrative hearings after the issuance of an expungement order pertaining to those records.

In response, BPD contends the Board did not err in allowing BPD to introduce copies of the photographs obtained from HCPD at Cintron's board hearing. Specifically, BPD argues *Gigeous* is not applicable in this case because HCPD disclosed copies of the photographs to BPD prior to issuance of the expungement order while the records at issue in *Gigeous* were disclosed after a court issued an expungement order. BPD also claims the expungement order in this case did not apply to BPD because BPD was not a named custodian in the order.

BPD additionally contends the Law Enforcement Officers' Bill of Rights ("LEOBR") expungement provision controls in this case because Maryland criminal expungement law does not apply to police misconduct records. BPD further argues the "criminal activity exception" to the LEOBR, which allowed Maryland law enforcement agencies to wait more than one year to bring police misconduct charges if such misconduct "relate[s] to criminal activity," Md. Code Ann., Pub. Safety § 3-106(b) (2003, 2019 Repl. Vol.), would break down if this Court overturns the Board's decision in this case. Even if *Gigeous* and state law on criminal expungement control in this case, BPD argues the Board did not err because the photographs would qualify as investigatory files exempt from the expungement statute and "the need for public safety and effective law enforcement far outweighs Cintron's right to privacy."

10

## B. Legal Framework

Maryland Code Annotated, Criminal Procedure Article ("CP") § 10-101(e) defines

expungement as:

> Except as otherwise provided in this subtitle, "expungement" with respect to a court record or a police record means removal from public inspection:
>     (1) by obliteration;
>     (2) by removal to a separate secure area to which persons who do not have a legitimate reason for access are denied access; or
>     (3) if access to a court record or police record can be obtained only by reference to another court record or police record, by the expungement of it or the part of it that provides access.

Relevant for this appeal, CP § 10-101(h) defines police record as:

> "Police record" means an official record that a law enforcement unit, booking facility, or the Central Repository maintains about the arrest and detention of, or further proceeding against, a person for:
>     (1) a criminal charge;
>     (2) a suspected violation of a criminal law;
>     (3) a violation of the Transportation Article for which a term of imprisonment may be imposed; or
>     (4) a civil offense or infraction, except a juvenile offense, enacted under State or local law as a substitute for a criminal charge.

Under CP § 10-105(a)(i), a person charged with the commission of a crime who was

acquitted "may file a petition listing relevant facts for expungement of a police record,

court record, or other record maintained by the State or a political subdivision of the

State[.]" Generally, this petition must be filed "in the court in which the proceeding began."

CP § 10-105(b)(1). "Unless the State's Attorney files an objection to the petition for

expungement within 30 days after the petition is served, the court shall pass an order

requirement the expungement of all police records and court records about the charge." CP

§ 10-105(d)(2). "[E]very custodian of the police and court records that are subject to the

11

order of expungement shall advise in writing the court and the person who is seeking expungement of compliance with the order." CP § 10-105(f).

Maryland Rule 4-508 specifies the details regarding service and contents of an expungement order. As to service:

> Upon entry of a court order granting or denying expungement, the clerk forthwith shall serve a true copy of the order and any stay of the order on all parties to the proceeding. Upon entry of an order granting expungement, the clerk shall serve on each custodian of records designated in the order a true copy of the order together with a blank form of Certificate of Compliance set forth at the end of this Title as Form 4-508.3. The State Court Administrator shall transmit electronically to the Central Repository the data included in the order.

Md. Rule 4-508(d). And as to the contents of the expungement order: "An order for expungement of records shall be substantially in the form set forth at the end of this Title as Form 4-508.1, as modified to suit the circumstances of the case." Md. Rule 4-508(a).

Maryland Rule 4-510 explains compliance with the expungement order:

> Upon receipt of an order for expungement that is not stayed or notice that a stay has been lifted, or, in the case of the Central Repository, notice of the data included in the order or lifting of a stay, each custodian of records subject to the order and the Central Repository shall forthwith remove the records from public inspection. As soon as practicable but in no event later than 60 days after the entry of a court order for expungement, or if the order for expungement is stayed, 30 days after the stay is lifted, every custodian of police records and court records subject to the order, including the Central Repository, shall comply with the order, file an executed Certificate of Compliance, and serve a copy of the certificate on the applicant or petitioner.

Key provisions of Form 4-508.1 summarize the expungement process:

> ORDERED that the clerk forthwith shall serve on each custodian of police and court records designated in this Order and on the Central Repository a copy of this Order together with a blank form of Certificate of Compliance; and it is further

12

ORDERED that within 60 days after the entry of this Order … the clerk and the following custodians of court and police records and the Central Repository shall (1) expunge all court and police records pertaining to this action or proceeding in their custody, (2) file an executed Certificate of Compliance, and (3) serve a copy of the Certificate of Compliance on the applicant/petitioner/defendant; and it is further

ORDERED that the clerk and other custodians of records forthwith upon receipt of this Order … shall remove the records from public inspection[.]

. . . .

**NOTICE TO APPLICANT/PETITIONER/DEFENDANT**: Until a custodian of records has received a copy of this Order AND filed a Certificate of Compliance, expungement of the records in the custody of that custodian is not complete and may not be relied upon.

As this Court previously observed, "the legislature appears to have promulgated the expungement statutes in response to *Doe v. Wheaton Police Dept.*, 273 Md. 262 . . . (1974)." *Gigeous*, 132 Md. App. at 500 (citing *Mora v. State*, 123 Md. App. 699, 710 (1998)).[8] Our review of *Wheaton* in *Mora v. State* revealed two important points about the Maryland General Assembly's purpose in enacting the expungement statutes:

> First, we learn that it is society's concern with individual privacy that evokes its recognition of an individual's need for expungement of a criminal record under certain circumstances. In other words, our society accepts that persons formally accused, but not convicted, of a crime should not be tainted with that arrest record in the pursuit of employment, education, licensing, financial transactions, or the like. Second, the individual's interest in privacy regarding such matters must be balanced against the State's interest in efficient and effective law enforcement procedures.

---

[8] Although the Supreme Court of Maryland declared this Court's holding in *Mora* dicta, "[w]e do not regard the [Supreme] Court's comments as a disapproval of the language or reasoning [this Court] used in *Mora*, but rather a finding that our reasoning could not properly be applied to the facts of that case, based on the record before [this Court]. Thus, the overall reasoning we applied in *Mora* was sound." *Gigeous*, 132 Md. App. at 499.

*Mora*, 123 Md. App. at 712. Regarding the balance between individual privacy interests and society's need for efficient law enforcement, we noted "[t]he Maryland Legislature took into account this balance when enacting the current expungement statute. In framing the statute, it did not define 'expungement' as total destruction of court records or police records, but rather as 'the effective removal of these records from *public* inspection.'" *Id.* at 716 (emphasis in original) (quoting Md. Code, Art. 27 § 735(c) (1957, 1996 Repl. Vol.)).

From the text of the statutes and legislative background, we discern the purpose of the criminal expungement law is to remove from public view the records of a criminal arrest and any subsequent court action. In other words, Maryland expungement law is a form of record-keeping that prohibits public disclosure of records related to a criminal charge and its ultimate disposition. As we discuss below, expungement does not mean that evidence gathered during a criminal investigation is destroyed and cannot be used in any circumstance if the case is ultimately expunged.

### C. Analysis

> *1. The Board Did Not Err in Allowing BPD to Admit Copies of the Photographs Because Cintron's Expungement Order Did Not Expunge Records in BPD's Custody.*

We conclude the photographs in BPD's custody could be used at the administrative hearing because they were not subject to the expungement order issued here. The District Court of Maryland for Howard County issued a Form 4-508.1 ordering expungement of Cintron's criminal records. As we discussed in the Factual and Procedural Background section, the order did not list BPD as a custodian of records—it listed CJIS, the District Court of Maryland-Howard County, the Howard County Police Department, and the

14

Howard County State's Attorney's Office. Because a court only need serve an expungement order "on each custodian of records designated in the order[,]" as specified in Rule 4-508, the District Court was not required to serve Cintron's expungement order on BPD. Because only custodians of police or court records "subject to the order of expungement" must comply with the order, as delineated in CP § 10-105(f) and Rule 4-510, BPD did not need to comply with Cintron's expungement order. Therefore, as outlined in the notice in Cintron's Form 4-508.1 expungement order, "expungement of the records in the custody of [BPD] is not complete and may not be relied upon." Accordingly, the Board did not err in allowing BPD to admit copies of the photographs taken by HCPD at Cintron's hearing.

Cintron's argument that the expungement order should apply to BPD because the order lists HCPD as a custodian of records, and BPD obtained copies of the photographs from HCPD, fails. Cintron's Form 4-508.1 expungement order specifies custodians designated in the order shall "expunge all court and police records pertaining to this action or proceeding *in their custody*[.]" (Emphasis added.) The notice at the end of the order also specifies "[u]ntil a custodian of records has received a copy of this Order AND filed a Certificate of Compliance, expungement of the records *in the custody of that custodian* is not complete and may not be relied upon." (Emphasis added.) Based upon this language, which is consistent with relevant Maryland Rules, only HCPD and the three other custodians listed in the expungement order needed to expunge records in their custody. HCPD received a copy of Cintron's expungement order and filed a Certificate of Compliance. So, expungement of police records in HCPD's custody, including the

15

photographs HCPD took on April 18, 2021, was completed and Cintron can rely upon HCPD's expungement. But when the District Court issued the expungement order to HCPD, the photographs BPD eventually introduced at Cintron's Board hearing were not in HCPD's custody—they were in BPD's custody. Therefore, HCPD had no duty under Cintron's expungement order—or any provision of the Maryland Code or Rules—to expunge copies of the photographs in BPD's custody that BPD eventually introduced at Cintron's Board hearing.

Cintron's reliance on *Gigeous* is also unavailing. In that case, officers of the Anne Arundel County Police Department arrested Gigeous for marijuana possession. 132 Md. App. at 493. Gigeous' employer, the Department of Corrections (DOC) division of the Maryland Department of Public Safety and Correctional Services, filed charges against Gigeous to terminate his employment. *Id.* "Meanwhile, the Anne Arundel County State's Attorney entered a *nolle prosequi* for the possession charges." *Id.* Gigeous then applied for expungement of records pertaining to his possession charges, which the court granted. *Id.* After the records were expunged, an administrative hearing was held on Gigeous' termination charges from the DOC, where the arresting officers testified and "documents concerning the arrest were admitted into evidence over [Gigeous'] objection that the records were expunged." *Id.* Importantly, the documents concerning the arrest introduced at Gigeous' hearing came from the Anne Arundel County Police Department, which was subject to the expungement order. *Id.* at 495, 499. Gigeous appealed the use of his expunged records in the hearing, and this Court concluded "any evidence admitted from the police investigative file, or any testimony based on information contained in the

16

investigative file[,]" did not constitute investigatory files which, pursuant to CP § 10-102(c)(5), are not subject to expungement. *Id.* at 502. Because the evidence and testimony were not investigatory files, they were expunged, and we determined "[d]isclosure to an agency outside of the police department, therefore, was inappropriate, and any evidence admitted at the administrative hearing that stemmed from that file was inadmissible." *Id.*

In summary, our decision in *Gigeous* involved a police department's inappropriate disclosure of *expunged* materials at an administrative hearing. In this case, however, HCPD did not disclose expunged materials at Cintron's Board hearing. Nor did HCPD disclose expunged materials to BPD—rather, HCPD legally disclosed copies of the photographs to BPD *before* the photographs in HCPD's custody were legally expunged. And BPD did not disclose expunged materials at Cintron's Board hearing because, as discussed, the photographs in BPD's possession were not legally expunged. Therefore, as BPD argues in its brief to this Court, *Gigeous* is inapplicable here.

The language in the Maryland Code, Maryland Rules, and Cintron's expungement order are clear and unambiguous such that "we need not look beyond the provision[s'] terms to inform our analysis[.]" *City of Frederick v. Pickett*, 392 Md. 411, 427 (2006). However, we briefly discuss legislative purpose to refute a proposition made by Cintron's counsel at oral argument before this Court. Cintron's counsel described the purpose of Maryland expungement law as erasure—past, present, and future. That is incorrect. In evaluating the Maryland General Assembly's purpose in enacting the expungement law, we concluded in *Mora* that part of the purpose was balancing "an individual's privacy interest" against "society's need for efficient law enforcement." 123 Md. App. at 716. The

17

General Assembly took this into account when it defined expungement—namely, it did not define expungement as erasure or "total destruction of court records or police records," but as removal from public inspection. *Id.*; CP § 10-101(e).

The General Assembly's desire to balance individual privacy and the need for efficient law enforcement is reflected in the expungement law's exclusion of certain items from expungement, such as investigatory files. CP § 10-102(c)(5). As we explained in *Gigeous*, "investigative files maintained by police are not subject to expungement to the extent that they relate to a police investigation and any subsequent prosecution that directly relates to the subject of that police investigation." 132 Md. App. at 502. Because we conclude the photographs BPD introduced at Cintron's Board hearing were not legally expunged, we need not address whether the photographs in BPD's custody constituted investigatory files.[9] However, this Court's discussion of investigatory files in *Gigeous* further highlights the purpose of the expungement law was not erasure of records as Cintron's counsel seemed to contend at oral argument. Rather than prohibiting State agencies from using expunged records at any time, the expungement law delineates procedures for how to remove records from public view—and exclude some records from

---

[9] We additionally do not need to consider BPD's argument that only the LEOBR's expungement provision, not Maryland criminal expungement law, applies to expungement of police misconduct records because neither prevented BPD from introducing the photographs at Cintron's hearing. Specifically, Cintron is not eligible for LEOBR-based expungement of the photographs in BPD's custody that constitute "the record of a formal complaint made against" Cintron because the Board did not acquit, dismiss, or find Cintron not guilty, nor have three years passed since the final disposition by the Board. Md. Code Ann., Pub. Safety § 3-110(a)(1) (2003, 2019 Repl. Vol.).

such removal—that reflect the General Assembly's purpose of balancing individual privacy concerns against sustaining efficient law enforcement.

In summary, the photographs in BPD's custody were not expunged according to the plain and ambiguous language of Maryland expungement law. The use of the photographs in this case also did not contravene the purpose of the expungement law.

Cintron's counsel urges us to transform the expungement statute into something akin to a complete evidentiary bar, but we will not go that far. "We will not invade the province of the General Assembly and rewrite the law for them, no matter how just or fair we may think such a new law or public policy would be." *Stearman v. State Farm Mut. Auto. Ins. Co.*, 381 Md. 436, 454 (2004). However, we do observe pragmatic concerns with the current state of Maryland expungement law. Namely, individuals requesting expungement may not know every custodian of records they seek to expunge, and there is no mechanism to notify these individuals of all such custodians. Regardless, "[t]he formidable doctrine of separation of powers demands that the courts remain in the sphere that belongs uniquely to the judiciary—that of interpreting, but not creating, the statutory law." *Stearman*, 381 Md. at 454. In so interpreting the clear and unambiguous language in the Maryland Code, Maryland Rules, and Cintron's expungement order, we conclude the photographs in BPD's custody were not legally expunged, therefore the Board did not err in allowing BPD to admit copies of the photographs taken by HCPD as evidence at Cintron's hearing.

Even if, purely for the sake of argument, we were to conclude the Board did err in allowing BPD to admit copies of the photographs taken by HCPD as evidence at Cintron's hearing, such error was harmless.

"In Maryland, the harmless error doctrine has been applied in judicial review of agency decisions." *State Bd. of Physicians v. Bernstein*, 167 Md. App. 714, 764 (2006). "[I]t is the policy of [Maryland appellate courts] not to reverse for harmless error and the burden is on the appellant in all cases to show prejudice as well as error." *Washington Suburban Sanitary Comm'n v. Lafarge N. Am., Inc.*, 443 Md. 265, 289 (2015) (quoting *Crane v. Dunn*, 382 Md. 83, 91 (2004)). "We have defined injury, or prejudice to the litigant, as error that influenced the outcome of the case." *Harris v. David S. Harris, P.A.*, 310 Md. 310, 319 (1987).

First, some of the photographs admitted are cumulative evidence, so if their admission into evidence constituted error, it was harmless. "In considering whether an error was harmless, we also consider whether the evidence presented in error was cumulative evidence. . . . [C]umulative evidence tends to prove the same point as other evidence presented[.]" *Dove v. State*, 415 Md. 727, 743-44 (2010). "Where erroneously admitted evidence has been cumulative, such admission has been held to be 'harmless error.'" *Dorsey v. State*, 276 Md. 638, 652 (1976).

BPD admitted into evidence copies of 22 photographs taken by HCPD on the night of April 18, 2021:

- Six photos were of Cintron: five of injuries to his arm and/or hand, and one of him standing against a wall.

- Eight photos depicted the bathroom in Cintron and Ortiz's home with broken glass and/or miscellaneous things on the floor.

- Four photos showed a hole in the bathroom door.

- Two photos were of damage to another bathroom door.

- Two photos depicted Ortiz's injuries to her hands and fingernails.

Officer Fogle testified in detail as to the injuries to Cintron's arm and hand, as well as the hole in the bathroom door. He did not, however, testify about Ortiz's injuries or the general state of the bathroom. Therefore, the photographs depicting Cintron's injuries and the hole in the bathroom door are cumulative and their admission constituted harmless error—assuming it was error.

Moreover, there is nothing in the record to indicate *any* of the photographs influenced the Board's finding of guilt and recommendation to terminate Cintron's employment with BPD. In fact, there is only one explicit reference to the photographs in the Board's Decision and Order: in the Administrative Charges section, the Board noted "[i]njuries to Officer Cintron's hand and arm were photographed." The Decision and Order made other references to records obtained from HCPD, which included copies of the photographs. In the Pre-Trial Motions section, the Board described BPD's "motion to allow records of the related criminal investigation from the Howard County Police Department," which the Board ultimately granted. And in the Evidence Presented section, the Board listed "Howard County Police Records," which included copies of the photographs and

Detective Valdes' request for HCPD's records, as one of BPD's evidentiary exhibits.[10,11] Even though the Decision and Order specified the Board made its findings of fact "[b]ased on the testimony and evidence presented at the hearing," we are hard pressed to conclude the photographs influenced the Board's finding of guilt and recommendation to terminate Cintron when the Board only made fleeting references to the photographs. Therefore, we do not make such a conclusion.

Overall, assuming for the sake of argument the Board erred in allowing BPD to admit copies of the photographs into evidence at Cintron's hearing, we conclude Cintron did not show prejudice from such assumed error. Accordingly, we deem any assumed error harmless.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. APPELLANT TO PAY THE COSTS.**

---

[10] BPD entered 19 total exhibits into evidence at Cintron's hearing, three of which were "evidence presented as to punishment or mitigation."

[11] In the Evidence Presented section, the Board also referenced HCPD's records in summarizing Detective Valdes' testimony. Specifically, the Board noted that Detective Valdes "testified that during the course of the investigation he reviewed the relevant documents and records provided by the Howard County Police Department."